**125**

Clifton B. BELCHER, Petitioner,

v.

Dr. P. J. CICCONE, Director, United States Medical Center for Federal Prisoners, Springfield, Missouri, Respondent.

Civ. A. No. 19222–3A.

United States District Court,
W. D. Missouri, W. D.

May 24, 1971.

As Amended June 22, 1971.

John Kane, Springfield, Mo., for petitioner.

Frederick O. Griffin, Jr., Asst. U. S. Atty., Kansas City, Mo., for respondent.

## JUDGMENT GRANTING PETITION FOR HABEAS CORPUS

WILLIAM H. BECKER, Chief Judge.

Petitioner, an unconvicted inmate of the United States Medical Center for Federal Prisoners, has filed prior actions in this Court in which he has not been able to sustain jurisdiction, apparently because of his inability to make proper use of the forms supplied by this Court or to comprehend the meaning of the orders of this Court. See Belcher v. Anderson (W.D.Mo.) Civil Action No. 18987–3A; Belcher v. Ciccone (W.D. Mo.) Civil Action No. 19013–3A; and Belcher v. Ciccone (W.D.Mo.) Civil Action No. 19062–3A. In the judgment in Civil Action No. 19013–3A, entered on January 19, 1971, petitioner was advised to seek legal assistance from the outside legal consultant at the Medical Center, Mr. John Kane, and copies of Local Rule 22 forms were sent to petitioner to be used for the purpose of filing a proper petition for habeas corpus in this Court with the assistance of Mr. Kane. The forms were misused again, however, resulting in denial of leave to proceed in forma pauperis in Civil Action No. 19062–3A on February 4, 1971. During a personal visit to the Court, Mr. Kane was advised of Mr. Belcher's need for legal assistance.

On February 24, 1971, petitioner submitted three forms, one of them comprised of writing on the back of disassembled pages of a Rule 22 form and the other two on plain sheets of paper. The first form states as follows:

"When one enters after inceptiong (sic) continuing conspiracy he becomes liable for acts of all conspirators, since conspiracy is, in effect, awarded/renewed each day its existance. Rias and Company v Association of American Railroads.

"Abraham Lincoln & Asso.
Clifton B. Belcher Asso.
Rohas."

The other two documents contained unintelligible writing, except for an assertion that petitioner has chosen for his attorney a named person who is not contained in the roster of Kansas City attorneys and yet is referred to by petitioner as a Kansas City attorney. Petitioner states that "We interviewed and talked for fifteen minutes in Fed.Med. Center Feb. 21 today."

From the foregoing, it appeared that inquiry into the nature and duration of petitioner's commitment and into the type of legal assistance granted him was justified. Therefore, the show cause order of the Court was issued on March 22, 1971, in which the Court stated as follows:

"From [petitioner's] prior actions in this Court, it is readily apparent that petitioner has been in the Medical Center since at least December 15, 1970. If he is an unconvicted inmate, there may be some question respecting whether he has been detained an unreasonable time under temporary commitments. Further, it is clear that petitioner is attempting to communicate with this Court but is unable to do so without legal assistance. This may be an instance in which petitioner's confinement is no longer justified but he has not been able to inform the Court of the facts and circumstances which are relevant because of his incompetency to do so. In such a case, the burden of rendering adequate legal assistance, particularly in view of the oral advice given to the outside legal consultant at the Medical Center on January 29, 1971, of petitioner's need for assistance, may be of paramount importance. Johnson v. Avery, 393 U. S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718, specifies that adequate legal assistance to prisoners includes 'preparation of the papers' as well as the 'initial decision that the prisoner's claim has substance.' Yet, even after the alerting of counsel to petitioner's plight on January 29, 1971, no intelligible claim has ever been received from petitioner.

"For the foregoing reasons, petitioner's forms of February 24, 1971, though improperly made and though they do not contain any poverty affi-

davit, to save time and unproductive effort, will be treated as a petition for habeas corpus and petitioner will be granted leave to proceed in forma pauperis. Respondent should be granted an opportunity to show cause why the writ of habeas corpus should not issue with respect to petitioner's continued detention in the Medical Center and the issue of adequate legal assistance."

█ After an extension of time was secured, respondent's response was filed on April 26, 1971. Thereto, respondent attached an order of the United States District Court for the Middle District of Tennessee dated April 29, 1970, showing that petitioner was committed to the Medical Center under the provisions of Section 4246, Title 18, United States Code, on that date. An attached letter from the Director of the Medical Center to the United States Attorney, dated April 1, 1971, reads as follows:

"On March 25, 1971 we received directly from the Clerk of Court show cause order issued in the above case on March 21, 1971.

"We find that Mr. Belcher was released from this institution on March 24, 1971 for return to the Middle District of Tennessee. At the time of his release our records did not indicate petition for Writ of Habeas Corpus to be pending, although we did have record of two inquiries from the office of Mr. John Kane concerning the case.

"Enclosed are copies of letters sent to the committing court by the Bureau of Prisons which were apparently the basis for the decision to return Mr. Belcher to the Middle District of Tennessee. We are also enclosing copies of correspondence exchanged with Mr. Kane concerning the case."

Attached also is an affidavit of John J. Kane, Esquire, concerning the issue of legal assistance. It reads as follows:

"I, John J. Kane, being duly sworn on my oath state the following:

"That the first knowledge I ever had concerning Clifton B. Belcher occurred on January 25, 1971, when I received a copy of the Western District Court Order in Civil Action No. 19013–3A which Order advised Mr. Belcher to seek legal assistance from me. Mr. Belcher had not before that Order nor has not since sought my legal assistance. Nevertheless, on January 25, I replyed (sic) to the Court with the original letter a copy of which is hereto attached as Exhibit A. [The letter, dated January 25, 1971, and addressed to the undersigned, states in part: "Later today I will interview each of the above named petitioners and oversee the proper presentation of their matters to your Court."]

"On the 27th day of January, I interviewed Mr. Belcher. My Administrative Assistant, Marilyn Potter, was present for that interview. Mr. Belcher's narrative abilities were at that time incredibly impaired. His word choices did not result in completed thoughts in particular sentences; nor, was there a notable pattern of thought apparant (sic) to me. The major part of his communication was fragmented and unintelligible in the extreme. He talked of various matters, personages and locations without any understanding or appreciation. I did not feel at that time that he was competent to even carry on a routine social communication. (Parenthetically, I wish to add, that I routinely come into personal contact with multi-numerous (sic) types of personality structures at the Medical Center and it was my layman-lawyer's sense at that time that this individual was, in fact, involuntarily unintelligible.)

"On January 29, 1971, on my own initiative, I attempted to visit various members of the Court in Kansas City. Not finding Judge Becker in his chambers, I asked to see Clerk Stewart. I do not recall Clerk Stewart having 'advised me of Mr. Belcher's need for legal assistance.' In fact, I recall relating to him the intention of my visit which was to tell the Chief Judge that I was satisfied that the

procedure recently begun in his Court of issuing orders denying Habeas Corpus, Granting Leave to Proceed in Forma Pauperis and advising Petitioner to contact legal assistants (sic) was an acceptable way of referring unintelligible matters to me. I further was seeking the Judge's advice with regard to program improvement.

"I, specifically remember telling Clerk Stewart that I had visited Mr. Belcher already. In fact, I had visited all Court referred inmates prior to my Kansas City trip. I also told Clerk Stewart about Mr. Belcher's condition; and, about how exasperating it was to try to establish communications with him. I remember, attempting in laymen's terms [to convey] that Belcher had a condition that I could best describe as a word usage problem similar to aphasia. I remember further attempting to explain the situation by indicating that where the Order had indicated case authority such as 'see Sutton vs. Ciccone' that Mr. Belcher had indicated that he had not seen Mr. Sutton in some time. He was apparently as confused with regard to time, persons, and concepts in his understanding as he was in his relating.

"On her own initiative, as a result of our interview with Mr. Belcher, my Administrative Assistant sent dated February 4, 1971, a copy of the Order of Denial in Civil Action No. 19013–3A. This was done because we could not get a definite statement from Mr. Belcher as to whether or not he knew who we were or why we were visiting him. He did not know whether or not his Habeas Corpus matter had been answered; although, he apparently had knowledge of parts of it.

"On February 9, two letters were written on Belcher's behalf; the first to Mr. William Tappana to find out under what provision of law Mr. Belcher was being held at the U. S. Medical Center, when he was committed to the Medical Center, etc. A second letter was written by Mrs. Potter on February 9, directing questions to Mr. Leon Horton, a social caseworker at the Medical Center, asking for information regarding Belcher's confinement and possible release or return dates and inquiring what, if any, transportation arrangements had been made. A letter of the 18th of February, 1971, in response to Mrs. Potter's committment (sic) inquiry stated that Mr. Belcher was committed under 18 USC 4246, that he arrived at the Medical Center May 6, 1970, that no definite release or return dates were known, and indicated further that the Director had previously recommended to the committing Court 'that Mr. Belcher might be considered for return for competency determination.' This letter bears the type mark of William Tappana and is signed by P. J. Ciccone. The meaning of the last phrase was not clear to us and we waited for Mr. Horton's reply regarding staff recommendations. That reply came to this office on the 11th day of March, 1971. That reply is attached hereto as positive indication of a staff finding. On March 15th Mr. Horton indicated to Mrs. Potter that he could not divulge the actual contents of a staff finding. However, in the discussion Mr. Horton indicated an observational opinion that Mr. Belcher's behavior was abnormal.

"We next contacted by phone the U. S. Attorney's Office in Nashville, Tennessee, and we were advised that they have a status report of December 22, 1970, in their file indicating that they had been in contact with 'P. J. Ciccone, director of the mental hospital in Springfield, Missouri. He stated that the letter indicated that the subject was rapidly improving and that he felt Belcher probably would be able to stand trial in the very near future and that Mrs. Lebach advised that Assistant U. S. Attorney Ira E. Parker indicated that Belcher's mental condition would again be checked at the end of March 1971, and at that time he would make a determination regarding prosecution of ·

Belcher in the Middle District of Tennessee.'

"The U. S. Attorney's Office for the Middle District of Tennessee further informed us that Belcher was to be returned for another competency hearing on April 1, 1971.

"Since the docket reflected this hearing and the Court indicated that transportation arrangements had been made no Arco motion or further action was undertaken.

"Upon receipt of your Court Order 19222–3A on the 25th day of March, 1971, I began a review of this office's handling of the Belcher matter. Even with the above assurances from the Court, the institution, and the U. S. Attorney's Office in light of the Court Order, it was decided that an Arco motion should be completed. Upon attempting to contact Mr. Belcher for the completion of such an Arco Motion this office was informed that pursuant to the request of the committing court for his return the U. S. Medical Center had released for return Clifton Belcher on the 23rd day of March, 1971.

"I only wish to further add the layman's observation to this affadavit (sic) with knowledge that this comment is irrelevant to the issue at hand. Apparently no one who has come in contact with Mr. Belcher except the staff pshchiatrists (sic) have found him able to meet even the minimum essential requirements of understanding or communicating. It is difficult for me to believe that this man is competent to stand trial for alleged criminal offenses."

The affidavit is dated March 31, 1971. A later affidavit of Mr. Kane is dated April 9, 1971, and reads as follows:

"I, John J. Kane, being duly sworn on my oath state the following:

"That on March 31, 1971, in response to prior contacts, Mr. Ira E. Parker, Assistant United States Attorney for the Middle District of Tennessee, Nashville Division, contacted me by phone to discuss Mr. Clifton B. Belcher. It was the feeling of Mr. Parker and, apparently that also of the Judge of the said District that Mr. Belcher was incompetent to stand trial. At this time, Mr. Parker also indicated his desire to attain a mental hospital committment (sic) for Mr. Belcher.

"Subsequent to this discussion, Mr. Parker agreed to notify me of the disposition of Mr. Belcher's case. Such notification was received by this office on April 3, 1971, and is hereto attached as Exhibit A. [A letter to Mr. Kane from Mr. Parker dated April 3, 1971, stating that "I am dismissing our indictment" and delivering petitioner to Indiana authorities, either for prosecution on a pending state charge or for commitment to the "Evansville State Hospital."]

"In light of the preceeding (sic) events, it seems reasonable to doubt Mr. Belcher's competency to stand trial or, even to meaningfully communicate with those attempting to assist him. It also seems reasonable to conclude that all those who have come in contact with Mr. Belcher, notwithstanding the psychiatric staff of the U. S. Medical Center, have found his interpretive and communicative abilities to be severely impaired."

On the basis of the response and the affidavits and other exhibits attached thereto, this Court is compelled to make a finding that petitioner was not rendered adequate legal assistance by the outside legal consultant hired by the Medical Center within the rule of Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718. From the affidavits of the legal consultant himself, it is determinable that he undertook to render legal aid to petitioner after the issuance of the judgment of this Court in Belcher v. Ciccone (W.D.Mo.) Civil Action No. 19013–3A on January 19, 1971; that he interviewed petitioner on January 25, 1971, and found petitioner's "narrative abilities . . . incredibly impair-

ed"; that he persisted from that time in his firm opinion that petitioner was unable to "stand trial for alleged criminal offenses"; that he discovered on or about February 18, 1971, that petitioner had been committed to the Medical Center under § 4246, Title 18, United States Code, since May 6, 1970; and that counsel never submitted thereafter any petition, motion or application in petitioner's behalf to this or any other Court, although, after the transfer of petitioner from the Medical Center, counsel considered filing a motion under Arco v. Ciccone (W.D.Mo.) 252 F. Supp. 347, affirmed (C.A.8) 359 F.2d 796. Yet, although more than two months transpired between counsel's initial interview and the date of counsel's discovery of the transfer of petitioner, and counsel had meantime discovered that petitioner was an unconvicted person who had been committed to the Medical Center for an unreasonable time, in view of his assessment of the extreme nature of petitioner's mental handicap, counsel made no effort to file any motion under § 4248, Title 18, U.S.C., for a return of petitioner to the committing court for consideration of his commitment to a state hospital in the state of his residence. Under the applicable law, it was evident almost from the beginning of counsel's acquaintance with petitioner's case that a petition for habeas corpus—either in this Court or the committing court—should have been filed in his behalf asking for relief under the provisions of § 4248, *supra*. This should have been readily apparent to counsel, if not from common sense and a knowledge of the letter of the applicable statutes, from the publications and case law applicable to the situation. In explaining the basis of Sections 4244–4248 of Title 18, United States Code, the Judicial Conference of the United States stated in a report dated July 30, 1945:

"If the accused's mental disability appears not to be a transitory condition, but in all likelihood he will, because of insanity, never be brought to trial, it would seem that as a general rule the federal government should not assume responsibility for his hospitalization merely because he has been accused (but not convicted) of a federal crime. *Normally such a person should be turned over to the state of his domicile to be confined in a state hospital if hospitalization is called for.*" (Emphasis added.)

See also Cook v. Ciccone (W.D.Mo.) 312 F.Supp. 822, 824, to the following effect:

"Thus, where an unconvicted person is confined in federal custody under 18 U.S.C. § 4244 or § 4246, and it is clear that his lack of competency to stand trial is permanent, or in view of the totality of the circumstances such incompetency and resultant confinement has existed for an unreasonable period of time and is not likely to immediately change to permit his trial, such person should be ultimately transferred to the appropriate state authorities for adequate control and treatment. In the event that state authorities will not accept the accused, consideration must be given to his outright release from federal custody. United States v. Jackson supra [(N.D. Cal.) 306 F.Supp. 4]. Such consideration is dictated by the inherent unfairness and substantial injustice in keeping an unconvicted person in federal custody to await trial where it is plainly evident that his mental condition will not permit trial within a reasonable time."

Nor can counsel's ignoring these applicable provisions of law be regarded as excusable because of the unusual difficulty of the doctrine. The rule is plain and clear and, in a recent opinion, the United States Court of Appeals for the Eighth Circuit thought the principle so apparent that it described detention in the Medical Center "for inordinate and indefensible periods of time" as "shocking" and "intolerable." See Henry v. Ciccone (C.A.8) 440 F.2d 1052 (No. 20,-422, April 15, 1971), a case in which the petitioner had been in the Medical Cen-

ter for only four months when he filed his petition for habeas corpus, yet the Eighth Circuit Court of Appeals was of the opinion that, in such cases, the petitioner was "entitled to a hearing upon the merits of his claim for release." The inapplicability of an *Arco* motion (as counsel states he contemplated filing) under these circumstances is also pointed out in *Henry,* in which it is stated that the "general salutory rule" of *Arco* "cannot apply universally to every situation." And it was particularly inapplicable in this situation in which counsel was convinced that petitioner was unable to stand trial because of his mental incompetence. All of the *Arco* motions, with the possible exception of the motion for appointment or direction of counsel to represent petitioner, are predicated upon a contention that petitioner is presently competent to stand trial—a contention which counsel was convinced was not true throughout the time period in question. See Arco v. Ciccone, *supra,* at 349. Further, in a case in which the petitioner is mentally incompetent and unlikely to stand trial for a reasonable time, an *Arco* motion can only be productive, in most instances, of more delay. The relief under § 4248 is not explicitly asked for in any of the *Arco* motions, and petitioner is therefore apt to receive a § 4247 commitment, thus prolonging his indefensible period of time in the Medical Center, unless the request for relief spells out the entitlement to relief under § 4248, *supra.*

In the case at bar, through the intercession of the United States Attorney for the committing district, it appears that petitioner may be in the process of being committed to a state hospital, in which he obviously, if the contentions of counsel are correct, belongs. But the legal consultant in the Medical Center would not have achieved that end even this quickly under the course of inaction which he chose to take. Further, the de-

lay from January 25, 1971, to the time of petitioner's release from the Medical Center—some two months—was unconscionable in view of the fact that petitioner had already been in the Medical Center for some nine months under a § 4246 commitment when his need for legal assistance became known to counsel. In the judgment of this Court in Belcher v. Ciccone (W.D.Mo.) Civil Action No. 19013–3A, a copy of which counsel admits having received on January 25, 1971, the need of petitioner for legal assistance was clearly pointed out. On January 27, 1971, counsel interviewed petitioner and found his narrative abilities "incredibly impaired." Whether petitioner was thought to be a convicted prisoner or an unconvicted one,[1] the proper response at this point would have been to check into the nature of his commitment to determine whether an apparently incompetent person was being detained in violation of rights which he could not express. Yet some 15 days passed before an inquiry in this regard was initiated. It is yet more astonishing that when it was learned by counsel on February 18, 1971, that petitioner had been committed to the Medical Center for almost 11 months and it was learned from the U. S. Attorney for the committing district that a return to the committing court for a "competency hearing" (rather than for arrangements for placement in a state hospital) was planned, no action was contemplated until the receipt of the show cause order in this case on March 25, 1971. (Further, no date is given when counsel learned of the possible return to the committing court, which may have been much later.) Then and only then, counsel conceived of the erroneous notion that it would be proper to file an *Arco* motion.

The record is thus clear that counsel, although aware of petitioner's circumstances and of his duty under Johnson v. Avery, *supra,* to assist petitioner in the

---

1. An incompetent convict may also be under commitments imposing special types of confinement upon him. See §§ 4241, 4247, Title 18, United States Code.

actual preparation of an appropriate legal action, inexcusably delayed in doing so and did not take care to apprise himself of the law applicable to petitioner's case.

Counsel seeks to excuse the default by stating that the law clerk of this division did not personally advise counsel of petitioner's specific needs for legal assistance during counsel's personal visit to this division on or about January 29, 1971. The allegation tends to be contradicted by counsel's admissions of having discussed at some length with the law clerk petitioner's mental inabilities—inabilities which, as has been found above, should have themselves alerted counsel to the need for legal assistance. But the proposed excuse is also gratuitous and unnecessary in view of the admission that counsel was already at the time well aware of petitioner's need for legal assistance.

■ Nor can counsel be excused in delaying any motion or petition or application on behalf of petitioner until he knew the results of a "staff finding" by the Medical Center. As was pointed out in Henry v. Ciccone, *supra*, in many instances "as soon as the application is filed the F.M.C. may determine the inmate physically and mentally sound." Thus, even though the Medical Center delayed in making a "staff finding" with respect to petitioner, it was the duty of counsel to act in order that the Medical Center itself might be prodded into action. In Henry v. Ciccone, *supra*, the United States Court of Appeals for the Eighth Circuit remarked that the cases in which unconvicted persons are kept in the Medical Center for long periods of time "show a shocking callousness to the rights of the inmates at the F.M.C." It is difficult to see how this callousness can be converted into sensitivity when counsel who is charged with a knowledge of the applicable law as well as with the special protection of inmates' rights has exhibited the imperviousness to the rights of an inmate such as have been exhibited in the case at bar. The writ of habeas corpus must issue with respect to the allegation of inadequate legal assistance.

■■ Respondent contends that the allegations regarding inadequate legal assistance are moot because petitioner has been released from the Medical Center and federal charges against him have been dismissed. Ayers v. Ciccone (C.A. 8) 431 F.2d 724, 726. But this Court retains the power to grant appropriate relief in respect to any records which might still be maintained in respect to petitioner in the Medical Center. In Mjolsness v. Ciccone (W.D.Mo.) 311 F. Supp. 1014, 1018, this Court ordered the Medical Center to expunge from the petitioner's record "all references to the alleged offense" of rendering legal assistance after the petitioner had been transferred from the Medical Center. A similar order will be issued in this case in order to cover the possibility that petitioner, during this period of time when counsel named above was inadequate, might have suffered punishments for seeking legal assistance from other inmates.

■ On the above facts, it must also be found that the petitioner was detained in the Medical Center for an "inordinate and indefensible period of time" within the meaning of Henry v. Ciccone, *supra*. Although petitioner was committed to the Medical Center by order dated April 29, 1970, and arrived there in the first part of May of the same year, the response submitted by respondent does not show conclusively that any evaluation or "staff finding" was made by the Medical Center staff during petitioner's commitment to the Medical Center, a period of some eleven months. In *Henry, supra*, a similar period of confinement extending through the time when there was a "staff finding" of "competent" was held to be indefensible. Further, according to Mr. Kane's affidavit, as early as December 22, 1970, the Director of the Medical Center had expressed the opinion that

petitioner was "rapidly improving" and would be able to stand trial in the "very near future." Yet, no action was taken for another three months and then apparently only because of the show cause orders issued by this Court. No evidence has been offered to show that petitioner was meantime unable to be returned to stand trial. It may exist, but it has not been produced with the response in this case. The Director's letter to the United States Attorney, dated April 1, 1971, purports to transmit "commitment papers and confidential classification reports." But no reports have been filed in this action.[2]

The Court also notes that petitioner apparently was not transferred from the Medical Center under any order of Court or other warrant of law. The records as produced in this case show that the order of April 29, 1970, of the committing court committing the accused until "mentally competent to stand trial or until the pending charges against him are disposed of according to law" was still in effect at the time of the transfer.

For the foregoing reasons, the writ of habeas corpus must issue. It is therefore

Adjudged that the petition herein for habeas corpus be, and it is hereby, granted and respondent is hereby ordered to expunge from petitioner's records any record of punishment or other adverse notation sustained by him for seeking or obtaining legal assistance from other inmates during the period January 19, 1971, to March 24, 1971. Care should be taken to clear such adverse notations as they might affect any presentence investigation and report after any conviction petitioner conceivably might sustain in the federal courts in the future. A report certifying that this has been accomplished should be forwarded by the respondent to this Court within 7 days of the date of entry of this judgment.

2. The burden is on the respondent to justify continued commitment under pre-

conviction commitment statutes. Cook v. Ciccone (W.D.Mo.) 312 F.Supp. 822.